1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK

2

3  ------------------------------------X
                          :

4  STATE FARM MUTUAL AUTOMOBILE    :
     INSURANCE COMPANY,          :

5                         :  04-CV-2609
              Plaintiff,    :

6                         :

7            v.         :  225 Cadman Plaza East
                         :  Brooklyn, New York

8  GRAFMAN, *et al.*,          :
                         :  June 25, 2010
              Defendants.  :

9  ------------------------------------X

10

11       TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
        BEFORE THE HONORABLE STEVEN M. GOLD
          UNITED STATES MAGISTRATE JUDGE

12

13  APPEARANCES:

14  For the Plaintiff:       JAY SHAPIRO, ESQ.
                       Katten Muchin Rosenman, LLP

15                      575 Madison Avenue
                      New York, New York  10022

16

17  For the Movants:         BRUCE S. ROSENBERG, ESQ.
                       Rosenberg Law, P.C.

18                      2631 Merrick Road – Suite 301
                      Bellmore, New York  11710

19

20

21  Court Transcriber:       RUTH ANN HAGER
                       TypeWrite Word Processing Service

22                      211 N. Milton Road
                      Saratoga Springs, New York  12866

23

24

25

Proceedings recorded by electronic sound recording, transcript produced by transcription service

1 (Proceedings began at 10:37 a.m.)

2          THE COURT:  Civil cause for motion hearing, <u>State</u>

3 <u>Farm v. Grafman, *et al.*</u>, 04-CV-02609.  Appearance for the

4 plaintiff, please.

5          MR. SHAPIRO:  Jay Shapiro, Katten Muchin Rosenman.

6          THE COURT:  And Jacob Kagan.

7          MR. ROSENBERG:  Bruce Rosenberg, Rosenberg Law, Your

8 Honor.

9          THE COURT:  Good morning.  Where did this money go,

10 Mr. Rosenberg?

11          MR. ROSENBERG:  Your Honor --

12          THE COURT:  What are these -- why -- what happened

13 to the $302,500.00 to "HSBC"?

14          MR. ROSENBERG:  As was already provided to State

15 Farm my client did not directly receive any proceeds --

16          THE COURT:  That's not my question.

17          MR. ROSENBERG:  -- and the balance of the funds were

18 moved from one piece of property to the last piece of

19 property, the residence that they live in in Staten Island.

20          THE COURT:  I don't understand what -- the words you

21 just used.

22          MR. ROSENBERG:  It --

23          THE COURT:  Who is HSBC?  $300,000.00 went to --

24          MR. ROSENBERG:  It's a bank.

25          THE COURT:  It's a bank?

3

1          MR. ROSENBERG:  I believe so.  HSBC --

2          THE COURT:  And did -- was it used to --

3          MR. ROSENBERG:  -- and same bank.

4          THE COURT:  -- pay a debt or make a deposit?

5          MR. ROSENBERG:  No, it was used -- it was simply

6    moved from the equity in -- from -- in the one property that

7    was left that was sold into the other property they still have

8    remaining.

9          THE COURT:  How do you move equity from one property

10   to another?  Did they pay --

11         MR. ROSENBERG:  When --

12         THE COURT:  You're telling me that HSBC holds a

13   mortgage on the property and they paid down their mortgage by

14   $302,000.00?

15         MR. ROSENBERG:  Yes, that's where the money went.

16         THE COURT:  Can you document that and show that --

17         MR. ROSENBERG:  Sure.

18         THE COURT:  -- the money went --

19         MR. ROSENBERG:  It is documented and I have given

20   some more --

21         THE COURT:  Where?

22         MR. ROSENBERG:  Well --

23         THE COURT:  Show it to me.  I have all the documents

24   that were submitted --

25         MR. ROSENBERG:  This morning --

4

1          THE COURT:   -- in connection with the motion.

2          MR. ROSENBERG:   Your Honor is not aware this

3    morning I --

4          THE COURT:   This morning?

5          MR. ROSENBERG:   No, no.   I don't have the documents

6    this morning, but yesterday during the confusion of the docket

7    I was not -- there was a -- the order notice --

8          THE COURT:   Yeah, yeah, yeah, yeah.

9          MR. ROSENBERG:   When the initial --

10         THE COURT:   Mr. LePack moved to adjourn his motion.

11   You did not.   We issued one order and five minutes later we

12   made it clear that we were only moving the LePack motion.

13         MR. ROSENBERG:   I'm not sure it was five minutes

14   but --

15         THE COURT:   Same day.

16         MR. ROSENBERG:   Anyway, when the initial notice came

17   out I contacted Mr. Wolfman [sic], the attorney --

18         THE COURT:   Yeah.

19         MR. ROSENBERG:   -- who I have no connection with

20   related to.

21         THE COURT:   Right.

22         MR. ROSENBERG:   And I explained to him the need for

23   further explanation or clarification of the fact that there

24   seems to be accusation that somehow my client had some

25   relationship with the purchaser of the property or if there

5

1   were issues to be involved in the closing.  He provided to me

2   and I received yesterday -- it was on the office -- a letter

3   stating specifically that the transaction was at arms' length,

4   fair market broker involved with it as well as a letter from

5   the attorney for the purchaser that says that there's no

6   connection at all between the purchaser and Jacob Kagan or any

7   entity --

8            THE COURT:  Who is the purchaser?

9            MR. ROSENBERG:  I don't know.  Mr. Goodman, Goodman

10  Music.  My clients have no connection with them whatsoever.

11  And as was explained I only have documents that Mr. Wolfman

12  provided.  Mr. Wolfman is in the process of creating the final

13  closing statement and is willing to provide any information

14  Your Honor would like.  And it's very -- there's no --

15  everything is transparent here, Your Honor.

16           THE COURT:  It's not transparent to me at all.  I

17  don't have any documents showing that these funds were

18  actually received by HSBC or that they were attributed to real

19  estate that is otherwise held by Mr. Kagan.

20           MR. ROSENBERG:  I have no problem providing --

21           THE COURT:  I don't have any documentation telling

22  me who Mommeck [Ph.] Realty is and why they got $197,000.00

23  out of the closing.

24           MR. ROSENBERG:  Your Honor, any explanation that is

25  required can be willingly provided if that's --

1          THE COURT:  That's what I ordered in March or April.

2          MR. ROSENBERG:  No, but I provided -- I provided the

3   documents to the closing attorney who handled it -- the --

4          THE COURT:  Fine.  I've already ordered, right, that

5   plaintiff is entitled to take discovery with respect to Mr.

6   Kagan's assets.  Is that correct?

7          MR. SHAPIRO:  You had ordered that, yes.

8          THE COURT:  And all of this happened -- this

9   transaction happened recently, right?

10          MR. ROSENBERG:  Yes, Your Honor.

11          THE COURT:  After Mr. Kagan's conviction was already

12   a done deal, right?

13          MR. ROSENBERG:  I believe so, Your Honor.  In

14   fact --

15          THE COURT:  Yeah.  So Mr. Kagan is not in the course

16   of continuing to commit crimes or engage in activities that

17   would expose him to prosecution, I presume, so there's no

18   reason he can't be deposed about this transaction.  Isn't that

19   correct?

20          MR. ROSENBERG:  Your Honor, I believe that Mr. Kagan

21   has stood on the assertion of Fifth Amendment rights.  I

22   believe --

23          THE COURT:  In connection with this transaction?

24          MR. ROSENBERG:  This transaction.  However, there's

25   still --

7

1          THE COURT:  Okay.  I'll allow a deposition of Mr.

2   Kagan with respect to this transaction alone, how he came to

3   sell the property, who he sold it to, how the sale was

4   negotiated, where the proceeds went.  I also assume that

5   Mister -- what's this lawyer's name?  Wolf -- Wolfman?

6          MR. ROSENBERG:  Yeah, Boris Wolfman.

7          THE COURT:  What's that?

8          MR. ROSENBERG:  I believe so.  Boris Wolfman.

9          MR. SHAPIRO:  Volfman [Ph.] with a V.

10         THE COURT:  These are not private matters.  This is

11  not attorney/client privilege.

12         MR. ROSENBERG:  Nobody suggested that --

13         THE COURT:  There's no reason he can't be deposed

14  about what took place either and his account -- the books and

15  records of his escrow account with respect to the matter

16  subpoenaed.

17         MR. ROSENBERG:  If they --

18         THE COURT:  If that's what plaintiff wants to do

19  I'll permit it.

20         MR. ROSENBERG:  If they feel the need, fine;

21  otherwise, I'm perfectly willing to request whatever it is

22  specifically.  Your Honor, I'm sorry that I'm not as versed in

23  real estate transactions.  I received eight pages of documents

24  explaining where -- what happened from the attorney.  I did

25  not handle closing --

8

1          THE COURT:  Mr. Rosenberg, you and I have spent a

2     lot of time --

3          MR. ROSENBERG:  -- nor know anything about it.

4          THE COURT:  -- together and I have a lot more

5     confidence in your intelligence than you're articulating right

6     now.  These transactions are unusual.  They have an unusual

7     component.  There's $200,000.00 going to a company and nobody

8     knows why or who it is.  There's two checks written to a bank

9     and you understand that this took place in the context of a

10    series of litigated motions into the bona fides of Mr. Kagan's

11    financial transactions.

12          If Mr. Kagan were truly concerned that no suspicions

13    be aroused by these financial dealings, I should think he

14    would have come to court before selling the property to alert

15    us it was taking place so no adverse inference be drawn from

16    the fact that it took place behind the Court's back in the

17    middle of litigation over his integrity with respect to

18    whether he's secreting assets to hide from a judgment given

19    some of the findings about credibility the Court has already

20    made.

21          Even if he didn't come forth in advance I would

22    assume that he would have documentation that would demonstrate

23    that the proceeds of the sale weren't used in anything but

24    legitimate ways.  The explanation that you tendered originally

25    was that he sold the property in order to pay restitution.

9

1   The restitution is a small percentage of the proceeds of the

2   sale.  The rest of the sale proceeds go to entities and

3   individuals that don't seem to have anything to do with the

4   transaction.  That's inherently suspicious and calls for a

5   detailed explanation and you, Mr. Rosenberg, have demonstrated

6   yourself to be more than sufficiently competent to understand

7   all of that.

8         MR. ROSENBERG:  If I may, Your Honor, respectfully I

9   understand everything Your Honor is saying and I requested --

10  reached out immediately to Mr. Volfman for documentation and

11  I -- my understanding is that the banking process and the

12  closing process takes longer than just a day or two.  There

13  are documents that get recorded.  It's time for a check to

14  come back into an account.  It doesn't just go out there and

15  you get it back the next day necessarily.

16        THE COURT:  When did the transact -- when was the

17  closing?

18        MR. ROSENBERG:  I don't have the closing document in

19  front of me, Your Honor.  Maybe Mr. Shapiro has it.

20        THE COURT:  Well --

21        MR. SHAPIRO:  The preliminary closing statement that

22  was one of the exhibits, Your Honor, says April 15th.

23        THE COURT:  Yeah.  So, you know, if this case -- if

24  this was a closing that took place a week ago everything you

25  would be saying would have great resonance with me.

10

1          MR. ROSENBERG:  I understand, Your Honor.

2          THE COURT:  This is a closing that's more than 60

3    days old.

4          MR. ROSENBERG:  I understand.

5          THE COURT:  What document -- what checks were cut

6    that don't clear within 60 days?

7          MR. ROSENBERG:  I would --

8          THE COURT:  Have you ever had a check that didn't

9    clear within 30 days?

10          MR. ROSENBERG:  No.  They usually bounce back way

11    before that, Your Honor.  I'm not suggesting that.  What I'm

12    suggesting --

13          THE COURT:  And I'm not angry with you but I'm very

14    skeptical of your client's position.  If the plaintiff wants

15    to take full-bore discovery over this transaction I think it's

16    more than appropriate and when they find the proceeds unless

17    there's a darn good explanation for what happened I'll be very

18    much inclined to recommend that an order of attachment be

19    filed.  This is the straw that may break the camel's back.

20          MR. ROSENBERG:  All right.

21          THE COURT:  Mr. Shapiro, is there a reason why a

22    lease pendance [ph.] wasn't placed on the property?  Isn't

23    that something that one can do pre-judgment?  I'm not really

24    aware of it too well.  Did we have this conversation before?

25    Is that why you're dropping your pen?

1          MR. SHAPIRO:  I didn't mean to drop it.

2          THE COURT:  That's okay.

3          MR. SHAPIRO:  I just put it down.  Thank you.

4          THE COURT:  Your frustration will be well earned.

5          MR. SHAPIRO:  We did and I'm confident -- because I

6     don't talk about lease pendance very often I'm confident we

7     did in this case and it was not an option.

8          THE COURT:  Okay.

9          MR. SHAPIRO:  So when you're through with Mr.

10    Rosenberg if I could have a brief opportunity.

11         MR. ROSENBERG:  Your Honor, if I may, I was not part

12    of those discussions.  I've read the transcripts.  I'm aware

13    of the issues that were raised and as well as the discussion

14    of standards of the law with regard to the cases,

15    identification of the assets, as well as the transparency

16    issues.

17         I respect Your Honor's ruling.  I'm not -- I don't

18    dispute that there could -- that there's a plausible

19    explanation.  I believe there is a very simple explanation.  I

20    think that rather than taking the position that plaintiff has

21    taken constantly and continuing to take as aggressive and -- I

22    understand the perception but once again we're getting into

23    filing unnecessary and undiscussed paperwork when, you know,

24    it's a demand "Give us everything" instead of saying, okay,

25    "Mr. Rosenberg, we have a question about this," I -- they

12

1   could have called Mr. Volfman.  There's no privilege there.

2          THE COURT:  Mr. Rosenberg, and you could have called

3   Mr. Shapiro.  None of this would have happened -- none -- if

4   this were truly an above-board transaction you could have

5   called Mr. Shapiro before the deal closed and I'm not really

6   talking about you.  I'm talking about Mr. Kagan.  You may not

7   have known about this until it happened as far as I know and I

8   would agree that that's not my business but Mr. Kagan has been

9   in this courtroom when these matters were discussed and he's

10  not a foolish man.  He knew what was going on and he could

11  have arranged for you to call Mr. Shapiro and said, "Mr.

12  Shapiro, Mr. Kagan needs to sell a piece of property that was

13  argued to the Court as part of the reason why an attachment

14  order shouldn't issue and I don't want to create an impression

15  with you or the Court that he's hiding assets.  So I'm telling

16  you he's selling the property.  I'm telling you the sales

17  price and the amount of debt on the property and here's where

18  the money is going to go.  I'm telling you two weeks in

19  advance of the closing so that if you think you're entitled to

20  any relief you have time to go to the Court and get it before

21  the deal."  You didn't do that.

22          MR. ROSENBERG:  I understand, Your Honor, but if I

23  may say with all due respect the reality here is that Mr.

24  Kagan as set forth with -- not that I had knowledge of when or

25  that even a transaction was going to take place I was not part

13

1   of it.  But given knowledge of what was going on in the

2   criminal proceeding and having had to deal with the issue of

3   being able to pay the restitution in the matter even though it

4   was maybe what the Court says is a minor amount in respect --

5   with regard to the transaction the fact of the matter is that

6   if the -- Mr. Kagan had done what you suggest given the

7   tendancy [ph.] of what's happened here then potentially

8   interference would -- for whatever reason there would have

9   been delay caused by any applications by it.

10          THE COURT:  And if he would taken out an equity line

11   of credit sufficient to pay the --

12          MR. ROSENBERG:  He can't get one.

13          THE COURT:  -- restitution he could have avoided the

14   whole thing.

15          MR. ROSENBERG:  Banking -- Your Honor, he couldn't

16   get a line of credit.  Given what's happened to his credit,

17   given the cases that have been filed against him, given every

18   single event that's happened both in this case --

19          THE COURT:  Okay.

20          MR. ROSENBERG:  -- and in society there's no way

21   in -- neither he nor people with great credit can possibly do

22   that so --

23          THE COURT:  Mr. Rosenberg, I mean, we could volley

24   this back and forth.  There was a way to do this without

25   raising the suspicions.  Even if it was after the closing you

14

1  could have said all the proceeds of the sale are in an escrow

2  account except for the check for the restitution that's been

3  paid.

4            MR. ROSENBERG:  I understand that.

5            THE COURT:  That's not what happened.

6            MR. ROSENBERG:  I understand, Your Honor.

7            THE COURT:  The proceeds are gone.

8            MR. ROSENBERG:  I understand and I --

9            THE COURT:  And I don't know where they went --

10            MR. ROSENBERG:  Well, I --

11            THE COURT:  -- and I want Mr. Shapiro to find out

12  and come back and if he thinks he's got a motion to freeze I'm

13  going to hear it and given the current state of the record if

14  it doesn't improve for Mr. Kagan I'm going to recommend it be

15  granted so let's have --

16            MR. ROSENBERG:  Well, I mean, I --

17            THE COURT:  -- open, clear disclosure.  Maybe he can

18  pull the money back or maybe if there -- if the money really

19  went to enhance equity in a piece of property one way to moot

20  the motion practice is by giving the plaintiff a lien on the

21  property.  If there's $300,000.00 more of equity in another

22  piece of property that he owns give the Government -- give the

23  plaintiff a lien on it and we won't be here.

24            MR. ROSENBERG:  When and if the plaintiff is

25  successful in proving a case --

15

1          THE COURT:  Ahh.  There'll be nothing left to

2   collect.

3          MR. ROSENBERG:  -- in which they're entitled to a

4   lien -- well, Your Honor, if they choose --

5          THE COURT:  Put it in an escrow account.

6          MR. ROSENBERG:  I --

7          THE COURT:  Why pay down the mortgage on a piece of

8   property so that we're here again in six months?  I'm not --

9   fool me once, shame on me.  Full me twice -- full me once,

10  shame on you; full me twice, shame on me.

11         MR. ROSENBERG:  Because Mr. Kagan is beginning -- is

12  going to be commencing a prison term and he was -- he was

13  under the direction and understanding that he needed to take

14  whatever action necessary to take care of his family while he

15  is away and that is what motivated us.  That is what this

16  about, his wife -- or given the circumstances with the nature

17  of this litigation, the costs of ongoing litigation,

18  everything in addition, he had to take these steps in order

19  that his family would be able to afford to live.  There is no

20  mal-intent or malfeasance in that.  The reality -- there's no

21  problem getting documentations.  Obviously Mr. Volfman should

22  have all the documents, whatever documents they'd like and

23  that's fine.

24         I think, Your Honor, I welcome it.  And not only do

25  I welcome it but I expect to be back before Your Honor with

16

1    other motions that are going to be coming up which I think Mr.

2    Shapiro might want to have some explanations ready for because

3    respectfully -- and I've said this before -- my office does

4    not have a policy of acting in this manner and it's --

5             THE COURT:  It's not about you.

6             MR. ROSENBERG:  No, but it reflects on it because

7    the bottom -- the reality is that as much as there is an

8    inference or a commentary that I could have reached out or I

9    should have said or I should have done --

10            THE COURT:  Only if you knew about it.

11            MR. ROSENBERG:  But it equally falls on Mr. Shapiro

12   and can -- to have -- to discuss -- to attempt to resolve

13   issues in a meaningful way before filing sanctions motions.

14            THE COURT:  Well, I have to be -- I don't want to

15   argue about it with you anymore, Mr. Rosenberg, but the first

16   thing that happened is that an order was issued to explain how

17   the funds were dispersed.  The response to that order was so

18   blatantly deficient that that's how we ended up here.  And

19   your contention that the reason for it being deficient was

20   because checks take time to clear doesn't really cut the

21   mustard because the time for the checks to have cleared and

22   for a detailed explanation to be able to be provided has long

23   since passed.

24            MR. ROSENBERG:  I understand that.

25            THE COURT:  Thank you.

1          MR. ROSENBERG:  I respect that and I thank Your

2    Honor for at least giving me the deference of listening to my

3    commentary and --

4          THE COURT:  Always.

5          MR. ROSENBERG:  -- thank you.

6          THE COURT:  Thank you, Mr. Rosenberg.

7          Mr. Shapiro, what do you want to do?

8          MR. SHAPIRO:  I'm going to ask for a little bit

9    further relief because I --

10          THE COURT:  What do you want?

11          MR. SHAPIRO:  Well, I'm going to ask that there be

12   at least a temporary order restraining the movement of assets

13   and I want to give you a little bit additional background.

14          THE COURT:  My problem --

15          MR. SHAPIRO:  Go ahead.

16          THE COURT:  -- before you start is that I don't have

17   the authority as a magistrate judge to enter it.  I have no

18   injunctive relief authority.  You have to make the application

19   to Judge Gershon.  If she refers it to me I'll be happy to

20   recommend it based on this record.

21          MR. SHAPIRO:  Well, we've ordered for the

22   attachment.  We've made the motion for the attachment.

23          THE COURT:  You made a motion for the attachment by

24   what vehicle?  Is that by a formal notice of motion that's

25   pending before Judge Gershon or is that by your letter of June

18

1   8th addressed to me?

2           MR. SHAPIRO:  No, Your Honor.  The -- now, you'll

3   have to -- if you would give me a moment just to go back to --

4           THE COURT:  You talking about the original motion --

5           MR. SHAPIRO:  Which --

6           THE COURT:  -- made years ago?

7           MR. SHAPIRO:  Right.  Which has always been --

8           THE COURT:  Denied without prejudice to renewal?

9           MR. SHAPIRO:  Exactly.

10          THE COURT:  All right.

11          MR. SHAPIRO:  Now if I may go on.

12          THE COURT:  Well, the most I can do -- my point is

13  this.  The most I can do is report and recommend.  Once I do

14  that Mr. Kagan is entitled to two weeks to file objections.

15  Once they're filed you're then entitled to respond.  Then

16  Judge Gershon will issue a ruling, so whatever relief you get

17  is at a minimum 30 days down the road.

18          MR. SHAPIRO:  I understand all that.

19          THE COURT:  Okay.  Okay.

20          MR. SHAPIRO:  But shame on Mr. Kagan if he moves the

21  assets --

22          THE COURT:  Well --

23          MR. SHAPIRO:  -- while that's going on.

24          THE COURT:  Well, but arguably --

25          MR. SHAPIRO:  So if I --

1          THE COURT:  -- you could go before Judge Gershon and

2    get a TRO issued, you know, on the spot and I just want to

3    make clear that procedurally this is a less efficient vehicle

4    for that kind of relief.  As long as you --

5          MR. SHAPIRO:  I --

6          THE COURT:  -- understand that, let's go.

7          MR. SHAPIRO:  I -- I'm sorry.  I do understand that.

8    I don't even know -- and I would have to look whether -- I

9    know we did argue this twice in 2006 and 2008 so I would

10   actually want to look to see if it was referred to you at some

11   juncture and that's why we had all those arguments --

12         THE COURT:  I believe so.

13         MR. SHAPIRO:  -- so -- all right, so if it was then

14   it's still pending.  Well --

15         THE COURT:  Yeah.  Go ahead and make your record in

16   any event.

17         THE COURT:  Let me make the record because I think

18   it is somewhat significant.

19         MR. SHAPIRO:  The first thing I have to point out is

20   that among the checks that were written on April 15th was one

21   to Mr. Rosenberg from Raphael & Marks, Attorneys at Law, and

22   the notation was 390 Graham, so that was $50,000.00.  So Mr.

23   Rosenberg had notice of the transaction presumably for quite

24   awhile.

25         THE COURT:  Why does that indicate notice to him of

20

1    the transaction before it closed?

2              MR. SHAPIRO:  Not before it closed.

3              THE COURT:  Oh, okay.  I --

4              MR. SHAPIRO:  Not before.

5              THE COURT:  All right.

6              MR. SHAPIRO:  I'm saying going back to April 15th.

7              THE COURT:  Yes.

8              MR. SHAPIRO:  The -- you made a comment before that

9    we don't know who Mommeck Realty is.  We do know who Mommeck

10   Realty is.  If I could refresh your recollection.

11             THE COURT:  Thank you.  Yes.

12             MR. SHAPIRO:  Mommeck Realty, I believe, is Kagan.

13   It's Mommeck Realty, LLC, and Mommeck -- we had a discussion

14   and then a need for a letter from Abraham Melamed if you

15   remember some time ago about Mommeck Realty and --

16             THE COURT:  Does it have to do with a transfer to

17   Victoria?

18             MR. SHAPIRO:  No.  What happened was -- is 390

19   Graham got transferred to Mommeck Realty so we were back

20   before you saying, Judge, it's been transferred to Mommeck

21   Realty, Kagan came forth and said, "Well, no.  Don't worry

22   about it.  Mommeck Realty is Victoria Kagan and Jacob Kagan so

23   the Kagans still have it."  So Mommeck Realty out of this

24   transaction received $197,500.00.  So that's -- Kagan still

25   has $197,500.00.

21

1          THE COURT:  Or at least he did for the moment --

2          MR. SHAPIRO:  He did have --

3          THE COURT:  -- when it was transferred from the

4    proceeds to Mommeck Realty.

5          MR. SHAPIRO:  He did on April 15th, right, or

6    whenever that cleared.  Boris Volfman with a V, who is the

7    attorney for Kagan and the one who incorporated Goodman Music,

8    received $290,000.00 and $102,000.00, two different checks.

9    So that's another almost 400 --

10         THE COURT:  Are those the HSBC amounts?

11         MR. SHAPIRO:  Yes.  Although one says $200,000.00.

12         THE COURT:  Yeah.

13         MR. SHAPIRO:  I don't understand the inconsistency

14   but, yes, those are the HSBC.  So if Mr. Rosenberg is correct

15   then Kagan still has that money also.

16         THE COURT:  Right.

17         MR. SHAPIRO:  So he has -- he has that $400,000.00.

18   We've got Rosenberg's -- Mr. Rosenberg's $50,000.00 that may

19   still be in the accounts.  We'd ask at a minimum while this

20   discovery is pending because now State Farm is going to expend

21   more money to get to I think the point it should be at and

22   should have been quite awhile ago, which is to get the

23   attachment.  So at this point we'd ask for at least a

24   temporary freeze of those accounts and those assets, whatever

25   is in those accounts.

1           As you pointed out, and I think it -- it is

2    particularly telling, it was not a lot of money that Mr. Kagan

3    asked to pay restitution.  And going back to what is really a

4    very lengthy record about Mr. Kagan's assets, I noticed this

5    morning when I was going through not Mr. Rosenberg's response

6    to this but the prior law firm who represented Mr. Kagan

7    mentioned that Mr. Kagan is a man with many business interests

8    and we do know he has many business interests.  We're learning

9    about it more as we go through this case.  So with all that

10   said, Your Honor, I don't think he can be trusted.  I don't

11   think he can be trusted at all.

12           THE COURT:  Well, what procedural -- how

13   procedurally would you like to do this?

14           MR. SHAPIRO:  Well, I'd ask if you can -- if it was

15   referred to you then you can make the decision.

16           THE COURT:  Well, no.

17           MR. SHAPIRO:  It was not --

18           THE COURT:  I can make a recommendation.

19           MR. SHAPIRO:  Could it --

20           THE COURT:  I cannot decide a motion for injunctive

21   relief.

22           MR. SHAPIRO:  Can you decide a preliminary

23   injunctive?

24           THE COURT:  No.

25           MR. SHAPIRO:  Okay.  Then we'd ask that you make a

23

1   recommendation to Judge Gershon now --

2           THE COURT:  Well --

3           MR. SHAPIRO:  -- for -- during the pendency of this

4   discovery which is still -- I assume that we'll nail down when

5   this will happen and time frames.  During the pending of that

6   we ask that -- we ask that you make a recommendation of that

7   during the pendency of the discovery that you've --

8           THE COURT:  Yeah.

9           MR. SHAPIRO:  -- ordered that any funds in the HSBC

10  accounts, in the Mommeck Realty account, the $50,000.00 that

11  Mr. Rosenberg has received, and the Volfman's account be

12  frozen.

13          We also ask that because of the possibility that Mr.

14  Rosenberg has now raised that the money is used to pay down a

15  house on Esmac Court in Staten Island.  It's E-S-M-A-C Court

16  in Staten Island that the Court direct that no financial

17  transaction -- no sale of that property or that property take

18  place or that property -- further that that property be not

19  encumbered by any other debts because if Mr. Rosenberg's

20  understanding is accurate then that's where a lot of this

21  money is situated right now.

22          THE COURT:  Question one.  Why is paying Mr.

23  Rosenberg devoid -- evidence that he's fraudulently concealing

24  assets or divesting himself of them in order to avoid a

25  judgment?

24

1          MR. SHAPIRO:  Well, we don't know --

2          THE COURT:  You're not alleging them.  I don't

3    imagine that Mr. Rosenberg is creating legal bills that exceed

4    what's due and owing so that money can be laundered through

5    his office.

6          MR. SHAPIRO:  No, not -- I'm not suggesting that.

7          THE COURT:  And I would urge you to withdraw the

8    $50,000.00 to Mr. Rosenberg which I assume is due and owing

9    for legal services rendered in this case.

10          MR. ROSENBERG:  Your Honor, actually I would like to

11    say something.

12          THE COURT:  Go ahead.

13          MR. ROSENBERG:  Most of the money in that check was

14    paid by my office directly to the State to complete the

15    payment for restitution.

16          THE COURT:  All right.  In addition, I really have

17    lost my patience.  During this entire proceeding I have

18    protested many times with regard to plaintiff and Mr.

19    Shapiro's and actions with regard to the plaintiff.  This

20    week --

21          THE COURT:  To the plaintiff?

22          MR. ROSENBERG:  With regard to Mr. Shapiro's actions

23    and statements.  All right.  I have been subjected to personal

24    attacks, personal sanctions motions, all the -- just

25    completely inappropriate professional actions.  And this week

25

1   I found out that Mr. Shapiro is actually a material witness in

2   a -- in a criminal action in this -- in New York State court

3   where he took a confidential deposition that he took of a

4   defendant and turned that over to the State and the State has

5   charged the witness with perjury based upon that testimony.  I

6   have a problem.  I think based upon Kattan's actions, which I

7   will bring before this court full proof of, has to be

8   conflicted out of this case as well as every other case.  This

9   has gotten down too far.  I've complained that they're acting

10  as an arm of the State, I've complained that they're using

11  discovery inappropriately, and now I have documentation coming

12  from the state attorney, the State of New York that a doctor

13  who's a defendant in one of the cases that Mr. Shapiro come

14  before this court constantly on has been utilized to foster a

15  criminal prosecution of a health care provider and that's what

16  raises a concern to Your Honor with regard to the deposition

17  transcripts in providing provision of the deposition

18  transcripts and the charges related --

19          THE COURT:  Is there a protective order that says

20  the deposition testimony can't be disclosed?

21          MR. ROSENBERG:  Whether it can or not the point is

22  he's become -- he's a material witness now in the criminal

23  case because his -- he is -- his deposition, his questions

24  he's performing --

25          THE COURT:  Well, Mr. Rosenberg, please.

1          MR. ROSENBERG:  -- an act of the State.

2          THE COURT:  That argument is silly.  The testimony

3    is recorded.

4          MR. ROSENBERG:  Well, maybe so.

5          THE COURT:  Mr. Shapiro is not a material witness to

6    that which is a matter of record.

7          MR. ROSENBERG:  Yes, he is because he -- Your

8    Honor --

9          THE COURT:  All right.  Well, if you have a motion

10   to make, you can make it.  I'm not here to listen today to

11   arguments about why Mr. Shapiro --

12         MR. ROSENBERG:  I understand that.  I'm just getting

13   a little perturbed at the inferences and statements being made

14   on the record about my office and about my --

15         THE COURT:  Well, it certainly doesn't improve your

16   position --

17         MR. ROSENBERG:  -- actions.

18         THE COURT:  -- to make them back at someone else

19   particularly when they're not coherent.  I don't see anything

20   wrong with a lawyer turning over evidence of criminality to a

21   prosecutor and one doesn't become a material witness simply

22   because they take a deposition.  The testimony is --

23         MR. ROSENBERG:  I think one --

24         THE COURT:  Otherwise, every lawyer would be a

25   material witness in every case in which they took a deposition

27

1  like this one.

2          MR. ROSENBERG:  I --

3          THE COURT:  So you're not saying, I'm sure, that

4  when an attorney takes a deposition in the course of a

5  litigation they become a material witness in that litigation

6  because they took the deposition and, therefore, they can't

7  proceed as counsel in it.

8          MR. ROSENBERG:  No.  What I'm saying, Your Honor, is

9  that when the line is blurred between state action and

10  independent action there's a question.  And there's been a

11  question as to what information the State might be able to

12  obtain and how they could obtain it or if they have a right to

13  obtain it vis-a-vis criminal matters.  If the transparency is

14  questioned then you go to the underlying factors of why the

15  questions and the intent of the deposition were taken vis-a-

16  vis and in light of what the accusations are in the --

17          THE COURT:  Thank you.  Thank you.

18          MR. ROSENBERG:  -- claim is a question.

19          THE COURT:  Mr. Shapiro, please don't even bother.

20  What do you want to do procedurally?

21          MR. SHAPIRO:  I made an application.

22          THE COURT:  Okay.  This is what I propose.  I want

23  you to -- I don't even have a proposed order.

24          MR. SHAPIRO:  Sure.

25          THE COURT:  The language of this order is going to

28

1   be critical to whether I can recommend its entry or not.  When

2   you're ready you should submit a notice of motion.  I don't

3   need a memorandum of law or affidavit.  You can incorporate

4   the arguments you made today and in your letters by reference

5   and a proposed order.

6           Mr. Rosenberg, what sort of procedural mechanism

7   would you like to raise any objection you might have that

8   hasn't already been aired?  Would you like a written response?

9   Would you like to come back to court?  What would you like?

10          MR. ROSENBERG:  I would like definitively the

11  opportunity to submit a written opposition.

12          THE COURT:  Within three business days.

13          MR. ROSENBERG:  And as well as if there becomes

14  apparent a reason to need to come before Your Honor we can

15  discuss it.

16          THE COURT:  You can ask for it in your written

17  response.  So Mr. Shapiro will serve when he's ready and

18  you'll have three business days to respond, all right?

19          MR. ROSENBERG:  Thank you, Your Honor.

20          THE COURT:  Thank you.  Is there anything else you

21  want from me today?

22          MR. SHAPIRO:  Just clarification as to the proposed

23  order.  Should I include -- should we include in that proposed

24  order the discovery aspect of what you've mentioned today?

25          THE COURT:  Well, I'm prepared -- no, you don't need

29

1   to do that.

2           MR. SHAPIRO:  Okay.

3           THE COURT:  I'm authorizing it right now on this

4   record.

5           MR. SHAPIRO:  Okay.

6           THE COURT:  And, you know, you may go back to your

7   office and decide that you want to take that discovery before

8   you ask for the order.  That's up to you.

9           MR. SHAPIRO:  Thank you.

10          THE COURT:  If you want to -- when I say you don't

11  have to submit a memorandum of law affidavit I'm not

12  precluding it.  If you want to rest on what you've already

13  submitted you can rest but obviously, you know, any

14  frustration with Mr. Kagan's transparency that I may have

15  expressed today may or may not be shared if the ultimate

16  decisionmaker is someone else, so you may want to think about

17  the quality of the record that supports your application.

18          MR. SHAPIRO:  Which is probably along those lines.

19  I will order -- when I get back to the office I will order

20  these minutes in an expedited fashion and -- because at least

21  that would be included --

22          THE COURT:  Sure.

23          MR. SHAPIRO:  -- in what we propose.

24          THE COURT:  Sure.

25          MR. SHAPIRO:  Then as to the discovery can that take

1   place within the next 30 days, then?

2          THE COURT:  Absolutely.  You can notice it at your

3   convenience --

4          MR. SHAPIRO:  Great.

5          THE COURT:  -- going forward from today.

6          MR. SHAPIRO:  Great.  Thank you, Your Honor.

7          THE COURT:  And frankly, Mr. Kagan's willingness to

8   answer these questions may be instructive if there's a candid

9   explanation and it's not a criminal transaction.  Now, I will

10  say, Mr. Shapiro, that you -- you know, this is not an

11  invitation to provoke an invocation of the Fifth Amendment.

12  The questions must be limited to the sale of 390 Graham, how

13  it came to be sold, and where the proceeds of the sales

14  went -- of the sale went, not how the equity was achieved in

15  the first place and where the proceeds to buy the property

16  from Mister -- by Mr. Kagan's purchase were derived.  Anything

17  that involves activities more than 30 days prior to the sale I

18  don't think are appropriately investigated on this deposition.

19         MR. SHAPIRO:  Right.  But I would assume that when

20  you say "and where the money went" it includes questions about

21  what those things -- what those entities or --

22         THE COURT:  And who owns them and controls them.

23  Absolutely.

24         MR. SHAPIRO:  Exactly.  Okay.  All right.  Terrific.

25  Thank you, Your Honor.

31

1          THE COURT:  Because presumably we're talking about

2   his current ownership.  Now, let's say he says money went to

3   Mommeck Realty.  Who is the owner of Mommeck Realty on the

4   date of the closing?  Who's the owner of Mommeck Realty today,

5   not who is the owner of Mommeck Realty when it put in an

6   application -- when it was leasing property to a medical

7   clinic run by a man who wasn't a doctor.

8          MR. SHAPIRO:  I understand.

9          THE COURT:  Okay.

10          MR. SHAPIRO:  I understand, Your Honor.

11          THE COURT:  Okay.  Goodbye.

12          MR. SHAPIRO:  Thank you, Your Honor.  Have a good

13   weekend.

14          THE COURT:  You, too.

15          MR. ROSENBERG:  Thank you, Your Honor.

16          (Proceedings concluded at 11:12 a.m.)

17                        *  *  *  *  *  *

18

19

20

21

22

23

24

25

32

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5

6  _____

7                              Ruth Ann Hager

8  Dated:  June 25, 2010

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25